**LUDEN'S, INC.**

v.

**UNITED STATES of America.**

Civ. A. No. 25978.

United States District Court
E. D. Pennsylvania.

July 18, 1961.

Fairfax Leary, Jr., C. Walter Randall, Jr., Saul, Ewing, Remick & Saul, Philadelphia, Pa., for plaintiff.

Walter E. Alessandroni, U. S. Atty., Philadelphia, Pa., for defendant.

GRIM, District Judge.

This is an action to recover corporate income tax paid because the taxing authorities disallowed a deduction claimed for interest which the taxpayer paid on its debentures.

For an understanding of this case there must be a recital of some corporate history.

William H. Luden, Inc., a Pennsylvania corporation, manufactured and sold cough drops and candies. The manufacturing plant was, and still remains, in Reading, Pennsylvania.

In 1926 or 1927 Daniel W. Dietrich purchased all or substantially all of the outstanding stock of William H. Luden, Inc. Shortly thereafter the name of the corporation was changed to Luden's, Inc.[1]

In 1929 a new corporation, Food Industries, Incorporated, was formed under the laws of Delaware. Daniel W. Dietrich transferred all his Luden's, Inc., stock to Food Industries, Incorporated, in exchange for half of the latter's common stock. At the same time other members of the Dietrich family transferred stock they held in four other corporations to Food Industries, Incorporated, in exchange for all of its preferred stock and the remaining half of its common stock. The recipient of the latter was H. Richard Dietrich, brother of Daniel W., so that the two brothers owned all the common stock of Food Industries, Incorporated. The preferred stock of the corporation was held by three Dietrich brothers of the "older generation", the father and uncles of the two common stockholders. This preferred stock had voting rights only on default on three successive dividends.

In 1951 the original Luden's, Inc.,[2] the manufacturing company, had outstanding 17,000 shares (of 35,000 authorized) of $10 par value stock, all owned by Food Industries, Incorporated. Luden's, Inc. then had outstanding no preferred stock and no bonds, debentures, or other long-term indebtedness.

In 1951, in order to solve corporate tax problems with the state of Pennsylvania, Food Industries, Incorporated, was merged into Luden's, Inc., the subsidiary corporation.[3] The capital structure of Luden's, Inc., the surviving corporation, was thereupon changed to 110,000 shares of $100 par value common stock, held half by Daniel W. Dietrich and half by H. Richard Dietrich, and 35,000 shares of $100 par value 6% preferred stock, held by various family trusts, the "older generation" being then deceased. In 1953 another 10,000 shares of preferred stock was issued.

Following the merger, the assets of the surviving corporation consisted of a portfolio of investment securities formerly held by Food Industries, Incorporated, and the plant and manufacturing business formerly held by the subsidiary. This business was operated as the Lu-

---

1. Not the taxpayer.

2. Not the taxpayer.

3. Just prior to the merger the subsidiary had assets of about $11,000,000. It had no preferred stock, no debentures, and no bonds outstanding.

den's division of the surviving corporation.

In June of 1954, the name of the surviving corporation, Luden's, Inc., was changed to The Dietrich Corporation. At the same time a new corporation, Luden's Inc., was formed under the laws of Pennsylvania as a subsidiary of the surviving corporation. It is this subsidiary which is the taxpayer and plaintiff in this case.

The assets of the surviving corporation's manufacturing division, including the right to use the name Luden's, trademarks, and good will, were transferred to the taxpayer in exchange for all of the taxpayer's common stock and debentures, as follows:

|  | Parent Corporation's Book Value | Additional Cost by Appraisal [4] | Adjusted Figures |
|---|---|---|---|
| Cash | $   100,000.00 |  | $   100,000.00 |
| Marketable Securities | 24,811.94 |  | 24,811.94 |
| Accounts Receivable | 340,456.34 |  | 340,456.34 |
| Inventories | 942,662.94 |  | 942,662.94 |
| Investments | 123,493.06 |  | 123,493.06 |
| Plant and Equipment | 942,981.71 | $1,883,069.85 | 2,826,051.56 |
| Deferred Charges | 9,951.83 |  | 9,951.83 |
|  | $2,484,357.82 |  | $4,367,427.67 |
| Accounts Payable | $   282,551.56 |  | 282,551.56 |
| Accrued Liabilities | 84,876.11 |  | 84,876.11 |
|  | $   367,427.67 |  | $   367,427.67 |
| Excess of Assets over Liabilities | $2,116,930.15 |  | $4,000,000.00 |

The result of this corporate rearrangement is that all of the manufacturing business is held and operated by the taxpayer (subsidiary) and the assets of the surviving (parent) corporation consist solely of investments.

The parent's reasons for separating the manufacturing business from the investment portfolio were to secure a more efficient operation of the manufacturing business, to create for that business a separate and distinct record of assets, liabilities, and earnings, to facilitate the sale of that business and, in the event of a sale, to lessen or postpone the income tax for which the parent might be liable in consequence.[5]

The parent is a personal holding company under Section 541 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 541, and therefore subject to high income tax rates on undistributed income.

The taxpayer's stock, all held by the parent corporation, consists of 10,000 shares of $100 par value common stock, a total of $1,000,000. The debentures likewise all held by the parent, are $3,000,000 of 4½% 15-year registered debentures. There are 30 debentures of $100,000 each,[6] transferable only on the

4. Prior to the transfer of these assets the surviving corporation had had the land, land improvement, buildings, and equipment of the Luden's division appraised by Manufacturers Appraisal Company. This appraisal was of the "sound value" of these assets, which was explained as being based on the cost of reproduction new less depreciation, as determed by observation by experienced appraisers.

5. For instance, by exchanging all the stock of the subsidiary for voting stock of the purchaser or by exchanging substantially all of the subsidiary's assets for voting stock of the purchaser.

6. The company agrees on request to substitute debentures in denominations of $1,000 "or any other authorized denomination."

books of the taxpayer, and redeemable at its option. They are not secured by pledge or mortgage or by guarantee of any third party. On default the principal may be declared due with the consent of 25% of the debenture holders. The promise to pay is unconditional. Interest is payable semi-annually.

Very shortly after the organization of the taxpayer the parent corporation lent the taxpayer approximately $1,000,000 so that it could build up an inventory of its products for the Christmas season. This loan was repaid in 1955, and there was a further similar loan later in 1955 paid before the end of the fiscal year.

The taxpayer paid to the parent corporation in the fiscal years 1955 and 1956 interest on these debentures in the sum of $135,000. The taxpayer claimed these interest payments as deductions on its income tax returns for those years. The deductions claimed were disallowed, additional tax was paid, and, after proper preliminaries, this action was brought to recover the additional tax.

In each of these two taxable years the taxpayer paid dividends of $30 per share on its stock, for a total of $300,000 per year, or $600,000 in all.

Section 163 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 163, provides:

"§ 163. Interest

"(a) *General Rule.*—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

Webster defines interest as:

"8. The price or rate of premium per unit of time that is paid by a borrower for the use of what he borrows: specif., a rate per cent of money paid for the use of money or the forbearance of demanding payment of a debt, * * *."

From the statute and the dictionary definition it is clear that to constitute interest the payment bearing that label must arise out of indebtedness, and in the creation of that indebtedness there must be an element of borrowing.

The government contends that the taxpayer is not entitled to deduct as interest the payments made on the debentures because the debentures were not indebtedness. They were not indebtedness, the government contends, because (1) despite their form they have some of the characteristics of equity capital or stock, (2) there was no element of borrowing, and (3) the issuance of debentures lacks commercial substance and must be disregarded for tax purposes because it had no purpose other than tax reduction.

These contentions will be considered in inverse order.

There have been cases in which transactions, on their face regular and binding, have been found to be devoid of commerical substance, having no other object than tax reduction, and therefore ineffective to accomplish that end. The most recent of these, and one on which the government places strong reliance, is Knetsch v. United States, 1960, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128. The facts of this case [7] are succinctly set forth in the taxpayer's supplementary brief:

"* * * The taxpayer, by making advance payments of premiums and interest on an annuity policy on a discount basis and borrowing back at a higher rate of interest the cash surrender value of the policy on a debt on which he was not personally liable, was out of pocket a substantial amount, had borrowed back at a higher rate of interest most of the money which he had paid into the insurance company and was left with an annuity policy substantially all the value of which had been taken out through the loan. The sole advantage to the taxpayer was the large interest deduction which, if allowed, would reduce his income taxes by more than he was out of pocket."

---

**7.** And also Weller v. Commissioner, 3 Cir., 1959, 270 F.2d 294.

530

The transaction in the Knetsch case was clearly nothing more than a set of financial gymnastics which had for its only tangible result (if the gymnastics had proved successful) the creation of a tax deduction. To grant them a tax effect would "contravene the legislative policy underlying the interest deduction."

In the case at bar there was more substance to the transaction than the mere creation of a tax deduction. There was obtained by the incorporation of the subsidiary a clear line of demarcation between the manufacturing business and the investment portfolio, and a separate and distinct record of the assets, liabilities, and earnings of the manufacturing business.[8] The effect of this was to render the manufacturing business more saleable. The possibility of selling that business was always considered, although in fact it was not sold. So, too, the existence of the debentures provided, at least in part, a built-in method of financing a sale, making it possible, for example, for The Dietrich Corporation to transfer the stock but retain the debentures.

The government contends that there was no element of borrowing of new capital here and that consequently there was no debt on which interest could be paid. The government has cited a number of cases on this point.

One of the cases cited by the government is Mullin Building Corp. v. Commissioner, 1947, 9 T.C. 350, affirmed per curiam, 3 Cir., 1948, 167 F.2d 1001. In holding that "interest" paid on "debenture preferred stock" was not deductible as interest, the Tax Court mentioned that "new capital was not wanted or obtained by the issuance of debentures," but there were other and more significant factors on which it rested its determination including the name "stock" applied to the instruments, the lack of a maturity or other date for

payment of the principal amount, and the finding that it was intended that the five per cent per annum on the debenture preferred stock should be paid out of earnings, all of which are characteristics of stock and not of debt. None of these other elements is present in the case at bar.

Another case cited by the government is Wetterau Grocer Co. v. Commissioner, 8 Cir., 1950, 179 F.2d 158, in which the corporate taxpayer claimed a deduction for "interest" paid on a series of notes which

"were not issued for borrowed money. They represented no new contribution to capital. They were exchanged for outstanding preferred stock which had been issued as a stock dividend to the common stockholders. The holders of these notes were the common stockholders and these notes simply supplanted outstanding preferred stock," 179 F.2d at page 160.

It should be noted that the notes were exchanged for existing preferred stock in this family corporation, the dividends on which were not tax-deductible. Other important factors which led the court in the Wetterau case to deny the deduction claimed for "interest" paid on the notes were the discretion given to the board of directors to fix the interest rate from time to time, the fact that the interest rate was to be determined on the basis of the company's earnings, the fact that the notes were subordinate to the claims of general creditors, and the fact that the notes were not negotiable and could be transferred only upon written notice and upon first giving the taxpayer an opportunity to redeem the notes. "The notes had practically all the characteristics of the preferred stock which they supplanted," 179 F.2d at page 160, none

8. The government argues that before the taxpayer was incorporated separate books on the candy and cough drop business were always kept. The separation of these records, and matters of judgment in deciding which items belonged in which books, might well become matters of dispute with taxing authorities and potential purchasers of the manufacturing business. The clear separation of the subsidiary's assets, records, and activities lessened the likelihood of disputes.

of which are possessed by the debentures in the case at bar.

A third case cited by the government is R. C. Owen Company v. United States, Ct.Cl.1960, 180 F.Supp. 369, in which there was a preexisting family partnership. The partnership transferred its business and assets to a newly-formed corporation which in return issued 35,000 shares of $1 par value common stock and $800,000 of debentures, "the stock and debentures being issued to the partners in exactly the same proportion as their interests had been in the partnership," 180 F.Supp. at page 370. The court held that payments on the debentures were not deductible as interest. It held that the debentures had the characteristics of stock, since no new money was loaned to the corporation, the debentures were issued to the partners in proportion to their respective interests in the partnership, no preferred stock was issued, the debentures were subordinated to indebtedness incurred by the corporation, the debenture holders had certain voting rights not ordinarily characteristic of debentures, and the debenture holders had the unusual powers arising under this provision:

> "Any and all provisions and agreements of this Debenture Bond, insofar as they affect the holders hereof, may be changed, altered, or amended by a vote in writing of the holders of these Debenture Bonds holding seventy-five per cent of the principal amount thereof * * *"

This provision, the court held, gave the holders of the debentures "almost as much control of the corporation as common stockholders," 180 F.Supp. at page 372.

The court continued, "Exclusion from control of the affairs of the corporation is an important factor to be considered. Other than as suggested above, the debenture holders, by the terms of the debentures, are excluded from control. However, it seems most noteworthy that the father, R. C. Owen, principal owner of the business, after he had completely divested himself of his holdings of stock * * * continued to be chairman of the board of directors, although he only owned debentures and no stock at all."

The court further said, "Without undertaking to state precisely what the debt to equity ratio was in the capitalization of the corporation, it is obvious that equity capital of $35,000 is entirely disproportionate in a business with a funded debt of $800,000 and current liabilities of $255,245.26."

An additional factor was that no dividends were ever paid on the stock, "the returns to the owners of the business being in the form of interest on the debentures."

It thus appears that while no new capital was brought into the business in the Mullin, Wetterau and Owen cases, this factor was only one of the elements which led to the decisions in those cases, and indeed an element which fades almost into insignificance when compared with the other factors present in those cases.

The remaining contention of the government is that despite the form of the debentures they have some of the characteristics of equity investments or stock. The characteristics pointed out are:

(a) The security is transferrable only on the books of the corporation.

(b) The redemption of the debentures is at the option of the issuing company.

(c) The debenture holders acquired certain voting rights not ordinarily characteristic of debentures.

(d) No security by way of mortgage, sinking fund, or personal guarantee of shareholders is provided, nor is there any provision with respect to how the debenture holders will share in assets in a liquidation.

The debentures are transferable only on the company's books. While this is a characteristic of stock, it is equally a characteristic of bonds and other securities which are registered, and since each debenture is payable under its terms "to The Dietrich Corporation, the Registered Owner hereof, or registered assigns," there is no doubt of the owner's power to assign. The matter of transfera-

bility by delivery is not a factor of great weight.

The fact that the debentures are redeemable at the taxpayer's option is an ambivalent factor. Surely, as long as the present corporation retains control of the taxpayer's stock, the debentures will not be redeemed contrary to the parent's wishes. If the parent should sell the stock but retain the debentures as evidence of or security for some or all of the purchase price of the stock, it will lose control of the taxpayer's right to redeem. Moreover, the debentures were not redeemable until January 1, 1958, $3\frac{1}{2}$ years after their issue date, and then only on an interest payment date and after 30 days' prior written notice. Many corporate bonds and debentures, and indeed many governmental bonds (federal, state, and local) are redeemable, with or without restrictions, at the option of the obligor. This factor does not diminish the debt qualities of the particular obligation.

The voting rights of the debenture holders in the case at bar are found in the debenture provisions as follows:

"3. The Company covenants that it will not, without the written consent of the registered owners of at least sixty-six and two-thirds per cent. ($66\frac{2}{3}\%$) of the aggregate principal amount of the Debentures then outstanding,

"(a) create, assume or suffer to exist any mortgage, encumbrance, lien or charge of any kind upon any of its assets whether now owned or hereafter acquired, except:

"(1) Mortgages on property hereafter acquired subject thereto, or mortgages given to secure the purchase price, or funds used for the purchase price of property hereafter acquired.

"(2) Pledges of assets as security for the payment of any taxes, assessments or other similar charges of any governmental body.

"(3) Statutory or common law liens for work done or services performed.

"(4) Liens for taxes or assessments on property not delinquent or the validity of which is in good faith contested by the Company.

"(b) merge or consolidate with any other corporation or sell, lease, transfer or otherwise dispose of all or substantially all of its assets to any person, firm or corporation;

"(c) incur, guarantee or become liable upon any indebtedness maturing or extended to mature in more than one year from the date of the original indebtedness in excess of Five Hundred Thousand Dollars ($500,000) outstanding at any one time, except indebtedness for which security may be given under subsection (a) of this section 3."

"6. (a) If any of the following events of default occur namely: (1) if the Company defaults in the payment of principal of or interest upon any of the Debentures after the same shall have become due and payable; or

"(2) if the Company makes an assignment for benefit of creditors, files a petition under any chapter of the Acts of Congress relating to bankruptcy or is adjudicated bankrupt; or

"(3) if a trustee or receiver of the Company or of any substantial portion of its assets is appointed and, if appointed under a proceeding brought against the Company, is not discharged within sixty (60) days after such appointment, or the Company in any manner acquiesces in such appointment; or

"(4) if any proceedings are brought against the Company under any law relating to bankruptcy, reorganization or insolvency and remain undismissed for sixty (60) days, then and in every such event, the principal of all of the Debentures then outstanding shall forthwith become due and payable without presentment, demand, protest or

notice of any kind, all of which are hereby expressly waived.

"(b) If the Company violated any of the covenants contained in Section 3 hereof, or if the Company defaults in the payment of principal or of interest upon any other obligation for borrowed money or any purchase money obligation, or in the performance of any agreement made in any such obligation, the effect of which default is to cause or permit the holder of such obligation to declare the principal amount thereof due and owing prior to its stated maturity, then and in every such event, if such default shall be continuing for a period of thirty (30) days, the Registered Owners of not less than twenty-five per cent. (25%) of the principal amount of the Debentures then outstanding may, at their option, exercised by written instrument with the Company, declare the principal of the Debentures to be forthwith due and payable and all Debentures shall thereupon become immediately due and payable with interest until paid, without presentment, demand, protest or other notice of any kind, all of which is hereby expressly waived."

Consent of the holders of the two-thirds of the debentures is required for the taxpayer to encumber any of its assets, with the exceptions set forth, to merge or consolidate or dispose of substantially all of its assets, or to incur more than $500,000 of indebtedness maturing in more than one year. On default, the holders of one-fourth of the debentures may declare the principal of the debentures due and payable before maturity.

The requirement that two-thirds of the holders consent to the encumbrance or disposal of the obligor's assets or to a sizeable increase in its long-term debt is a form of security for the debentures, which the government claims are not true debt on the ground that they are not secured, because the power to withhold consent to the encumbrance or disposi-

tion of assets has the same effect as an encumbrance on those assets.

The requirement that one-fourth of the debenture holders combine to accelerate the maturity date of the principal is included to prevent a smaller group of debenture holders, or even one, from upsetting the financial applecart if there should be a default of no genuine economic consequence, as for instance by being a day or two late in making an interest payment when the delay resulted not for inability or disinclination to pay but from inadvertence or carelessness.

Both of the "voting" provisions would be of value if the debentures were to become publicly held, and indeed the taxpayer argues that similar provisions are to be found in many issues of debt securities, citing, as to the maturity provision, Kraft Foods, Inc. v. Commissioner, 21 T.C. 513; 2 Cir., 1956, 232 F.2d 118.

In comparing the rights of the debenture holders in the case at bar with the unusual rights of those who held the disputed securities in the Owen case it becomes apparent that the rights of these debenture holders are quite pedestrian in character. These debenture holders do not have the right to rewrite the debentures as did the debenture holders in the Owen case, and by that means control the obligor corporation.

To the impartial observer the debentures in the case at bar have the look of ordinary debentures, and this look is not colored significantly by the "voting" provisions.

Lastly the government attacks the validity of the debentures for income tax purposes on the ground that there is no security such as a mortgage, sinking fund, or personal guarantee, and because there is no explicit provision as to how the debenture holders are to share in assets in liquidation. The first point assumes that to be a valid debenture it must be secured in some way, an assumption that appears to be totally unsupported. The fact that there may be secured debentures, sinking fund debentures,

and guaranteed debentures in existence does not mean that there cannot be perfectly valid unsecured debentures. Moreover, as has been demonstrated above, the necessity of consent to the encumbrance of assets, etc., amounts to a form of security.

Since these debentures are debts of the taxpayer, and since there is no explicit provision on the status of the debentures in the event of liquidation, it seems obvious that the debenture holders would be general creditors and share as such with other general creditors. I see in this nothing to indicate that the debenture holders are stockholders. Stockholders, indeed, normally share in assets in liquidation only after the creditors have been paid in full.

Plaintiff is directed to submit an order for judgment in its favor.