294 F.2d 876
 61-2 USTC P 9678
 FABREEKA PRODUCTS COMPANY, Petitioner,
v.
COMMISSIONER OF IMTERNAL REVENUE, Respondent.
Sadie S. FRIEDMAN, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Jack L. SHERMAN et al., Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 5787, 5795, 5801.
 United States Court of Appeals First Circuit.
 Oct. 5, 1961.
 
 Kenneth W. Bergen, Boston, Mass., with whom Josiah A. Spaulding, M. Gordon Ehrlich, Boston, Mass., William A. Klein, Washington, D.C., and Bingham, Dana & Gould, Boston, Mass., were on brief, for petitioners in Nos. 5787 and 5801.
 Jack H. Calechman, West Haven, Conn., with whom Alford P. Rudnick and Brown, Rudnick, Freed & Gesmer, Boston, Mass., were on brief, for petitioner in No. 5795.
 Gilbert E. Andrews, Jr., Atty. Dept. of Justice, Washington, D.C., with whom Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondent.
 Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit judges.
 ALDRICH, Circuit Judge.
 
 
 1
 These three cases illustrate that there is nothing more conducive to disagreement than the matter of interpreting a statute whose apparent meaning would produce in the particular instance a result distasteful to the court. The common question is how far a court should go in analyzing a transaction or series of transactions literally within a statute, in the light of a finding that a taxpayer's sole motivation was tax-avoidance, and interpreting the statute to deny a claimed deduction. The Fabreeka Products Co. and Sherman cases led to five different approaches in the Tax Court; the Friedman case to six. Friedman was based principally upon the court's prior divided decision in Maysteel Products, Inc., 1960, 33 T.C. 1021, which has since been reversed by a divided court in Maysteel Products, Inc. v. Commissioner, 7 Cir., 1961, 287 F.2d 429. A majority of the Tax Court has decided against the taxpayers and they seek review.
 
 
 2
 Stripped of the circumstances which show motive, the facts in Fabreeka Products Co. are rather simple. Fabreeka was in the manufacturing business. It had six stockholders. In October 1954 it obtained a loan from a bank. With this money and some of its own, it purchased public utility bonds which were callable on thirty days' notice at a substantial premium above the call.[1] The loan covered the callable amount, and the bonds were pledged to secure it. Had the bonds been called, Fabreeka, of course, would have suffered the loss of the premium. In the year in question Section 171 of the Internal Revenue Code, 26 U.S.C.A. 171, provided that with respect to bonds (with certain irrelevant exceptions) purchased above the call price a taxpayer, at its option, might amortize the premium to the earliest callable date whether the bonds were called or not. These bonds were not called. Febreeka held them for thirty days, wrote off the premium as a deduction, and distributed the bonds, subject to the loan, to its stockholders as a dividend. The stockholders promptly sold them at essentially the same premium, paying off the loan and retaining the premium. In this manner Fabreeka, if successful, will have distributed a dividend and taken an equivalent deduction thus in effect indirectly doing what it could not do directly. A number of subsidiary facts support the Tax Court's finding that taxpayer entered into this transaction only to accomplish this proposed tax savings.
 
 
 3
 In Sherman an individual taxpayer purchased similar (in fact, the same) bonds at a premium, wrote off the premium in thirty days, and sold them after six months, reporting the recovered premium as a long term gain. Had he sold at the price he bought (actually he fared less well), he would have had a net deduction of one-half of the premium. Again, the court's finding that the anticipated tax saying was the sole motive for the entire transaction was amply supported.
 
 
 4
 The Friedman the taxpayer, instead of selling such bonds, gave them to a charity, subject to the lien for the purchase loan. The charity's subsequent sale netted the premium for itself, and the taxpayer claimed two deductions, first for the amortized premium and second for the charitable gift. The government's anguish here is understandably intense because the taxpayer's bracket is such that if she is allowed both deductions she will show an over-all profit, thereby, in its opinion, demonstrating far too tangibly the blessedness of giving.
 
 
 5
 The government admits that all petitioners have brought themselves within the literal language of the statute. Nor can it say, except with tongue in cheek, that the transactions were shams. The brightness of the motive cannot be permitted to blind our eyes to the existence of substantive events. Granite Trust Co. v. United States, 1 Cir., 1956, 238 F.2d 670, 678. The government's charge that there was 'no reality to the transaction as an investment' amounts only to saying that it was not entered into for what it describes as 'investment motives'. It argues that these were 'sophisticated and elaborate[2] tax avoidance schemes where taxpayers (were) willing to pay money out-of-pocket or to take some measure of risk to establish a claim to tax benefits in a much larger amount.' But this describes neither a sham transaction, nor one unmarked by events or risks beyond the control of the taxpayer, nor one different in substance and effect from what it appeared to be on its face. Cf. Commissioner of Internal Revenue v. Tower, 1945, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670; Johnson v. Commissioner, 2 Cir., 1936, 86 F.2d 710; Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Knetsch v. United States, 1960, 364 U.S. 361, 81 S.Ct. 132 5 L.Ed.2d 128.
 
 
 6
 Whatever their ultimate purpose, the taxpayers made actual 'investments' in the ordinary sense of the word. They purchased the bonds. During the necessary holding period they incurred fully all of the risks of ownership, both that the bonds might decline in value, a real risk, as Sherman learned to his cost, and the possibilities that during that time they might be called. This latter exposure, however negligible it may have been in fact, was the very matter for which the statute provided the deduction. The subsequent sale or other transfers were not paper proceedings, but were transactions done legitimately every day. Other taxpayers might have done exactly the same thing, and if they had left no indicia of motive thrir deductions would have been unqustioned.
 
 
 7
 We may distinguish between general motives of tax avoidance, which admittedly of themselves cannot destroy an otherwise legitimate deduction, and the affirmative motive-- of 'investment'-- which the government claims is needed to come within this statute. Nevertheless, less, unless Congress makes it abundantly clear, we do not think tax consequences should be dependent upon the discovery of a purpose, or a state of mind, whether it be elaborate or simple. The limitation which the government asks us to read into the statute, even if appealing in the particular instance, might readily, as we said in another connection in Eaton v. White, 1 Cir., 1934, 70 F.2d 449, at page 452, 'create difficulties and uncertainties more objectionable in their results than any seeming inequities which would be eliminated or prevented.' Granting the government's proposition that these taxpayers have found a hole in the dike, we believe it one that calls for the application of the Congressional thumb, not the court's.[3]
 
 
 8
 Judgments will be entered vacating the decisions of the Tax Court and remanding the actions for further proceedings not inconsistent herewith.
 
 
 
 [1]
 The government has not maintained that this or the other taxpayers paid an artificial price
 
 
 [2]
 This phrase came from Gregory v. Helvering, infra. We are not sure the government likes it too well. Later it uses the characterization 'crude and blatant.' This contradiction may be some indication of the government's difficulties. Nor do we think a dog is to be hanged simply by giving him a bad name. See, in general, Rice, Judicial Techniques in Combating Tax Avoidance. 51 Mich.L.Rev. 1021, 1026 er seq. (1953)
 
 
 [3]
 It may not be irrelevant to note that when Congress did amend the statute by the Technical Amendments Act of 1958, 13, 72 Stat. 1606, 1610, it made a change in no way corresponding to what the government now proposes