Milton L. HALLE and Rachel N. Halle, his wife,

v.

UNITED STATES of America.

Civ. No. 14689.

United States District Court
D. Maryland.

Aug. 13, 1964.

Eugene H. Schreiber, Baltimore, Md. (Charles M. Cahn, Jr., and Blades & Rosenfeld, Baltimore, Md., on brief), for plaintiffs.

Moshe Schuldinger, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston, David A. Wilson, Jr., Attys., Dept. of Justice, Washington, D. C., and Thomas J. Kenney, U. S. Atty., and Robert W. Kernan, Asst. U. S. Atty., Baltimore, Md., on brief), for defendant.

THOMSEN, Chief Judge.

This is an action for the recovery of income taxes and interest alleged to have been illegally assessed. Taxpayers claimed deductions for amortization of bond premiums and for interest expense, as well as for a charitable contribution, arising out of the transaction set forth in the statement of facts, below. The Commissioner allowed the charitable deduction, but disallowed the deductions for amortization and interest on the ground that they arose out of a sham transaction. The seller of the bonds had given taxpayers a "put" option, and the government contends that the option takes the case out of the purview of sec. 171 of the Internal Revenue Code of 1954, 26 U.S. C.A. § 171, which controls the case. The material portions of the applicable statute and regulation are set out in note 1, below.

*Facts*

On November 24, 1954, plaintiff-taxpayer, Milton L. Halle, purchased from Livingstone & Company of Boston, Massachusetts, $100,000 face amount of Mississippi Power Company 3% bonds for $110,000, plus accrued interest of $500. The bonds had been issued prior to January 22, 1951, had a maturity date in 1979, and were callable at 100½ at any time on 30 days notice.

1. I.R.C. 1954:

"§ *171. Amortizable bond premium*

\*   \*   \*   \*   \*

"(b) *Amortizable bond premium.—*

"(1) *Amount of bond premium.—*For purposes of paragraph (2), the amount of bond premium, in the case of the holder of any bond, shall be determined—

\*   \*   \*   \*   \*

"(B) with reference to the amount payable on maturity or on earlier call date (but in the case of bonds described

Simultaneously with the purchase and incident thereto, Livingstone & Company granted to Halle an irrevocable "put" option on the bonds, exercisable until January 5, 1955, at a price of 108, plus accrued interest. In other words, Livingstone & Company agreed to repurchase the bonds at that price, if offered within 42 days.

To finance the purchase Halle borrowed $100,500 from a bank, pledging as collateral security for the loan a cash deposit and the bonds. Interest on the indebtedness was payable at 3¼% per annum.

On December 28, 1954, some 34 days after the date of purchase, Halle donated the bonds, subject to the lien of $100,500 held by the bank to Damil Foundation, Inc., an exempt charitable corporation. On the same day, Halle assigned to the Foundation the irrevocable "put" option referred to above.

On the following day, December 29, 1954, the Foundation exercised the option by reselling the bonds to Livingstone & Company at 108, plus interest. On the same, day Livingstone & Company sent to the Foundation a check for $8,183.33, representing the net proceeds due it on the sale.

For several years prior to 1954 Halle had made contributions to the Foundation. Before purchasing the bonds involved in this case, he had learned of the possible tax benefits to him as a result of the transaction described above; his motives for purchasing and contributing the bonds as he did were to make the charitable contribution and to derive for himself the tax benefits which he believed to be incident to the transaction.

On their federal income tax return for the year 1954, plaintiffs elected to amortize the premium of $9,500 on the bonds (representing the difference between the purchase price and the call price) to the nearest call date, which was 30 days after the date of purchase, or December 24, 1954. Accordingly, on their return for the year 1954, plaintiffs claimed the following deductions:

| | |
|---|---|
| Amortization of Bond Premiums | $9,500.00 |
| Interest Expense | 500.00 |
| Charitable Contribution to the Damil Foundation, Inc. | 8,225.00 |

The District Director, upon auditing the return, allowed the contribution to the Foundation as a deduction, but disallowed the deductions for interest expense and amortization of bond premiums. Plaintiffs made an additional payment of $3,999.12 income tax for 1954, plus interest thereon of $1,282.35, and filed a timely claim for refund, which was denied by the District Director.

### Discussion

The controlling principle was stated by the Supreme Court in Gregory v.

in subsection (c) (1) (B) issued after January 22, 1951, and acquired after January 22, 1954, only if such earlier call date is a date more than 3 years after the date of such issue), and

\* \* \* \* \*

"(2) *Amount amortizable.*—The amortizable bond premium of the taxable year shall be the amount of the bond premium attributable to such year. In the case of a bond described in subsection (c) (1) (B) issued after January 22, 1951, and acquired after January 22, 1954, which has a call date not more than 3 years after the date of such issue, the amount of bond premium attributable to the taxable year in which the bond is called shall include an amount equal to the excess of the amount of the adjusted basis (for determining loss on sale or exchange) of such bond as of the beginning of the taxable year over the amount received on redemption of the bond or (if greater) the amount payable on maturity. \* \* \*"

Treasury Regulations on Income Tax (1954 Code):

"§ 1.171–2. *Determination of Bond Premium.*

"(a) *In General.* \* \* \*

\* \* \* \* \*

"(3) Whether the purchase and immediate transfer of callable bonds occurs in such a manner as to make the entire transaction not bona fide, and hence the deductions for amortization for bond premium not allowable, will depend on all the facts and circumstances. \* \* \*"
(26 C.F.R., § 1.171–2)

Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), as follows:

"* * * The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Superior Oil Co. v. Mississippi, 280 U.S. 390, 395, 396, 50 S.Ct. 169, 74 L.Ed. 504; Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214, 217. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. * *"

That principle was reiterated and applied in Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960), and in Bridges v. C.I.R., 4 Cir., 325 F.2d 180 (1963).

Following the teaching of those cases, we must look to the "intent of the statute", to decide whether Congress meant to authorize an amortization deduction as the result of a transaction such as the one involved here. Happily, the Congressional purpose has been stated by the Supreme Court, in Hanover Bank v. C.I.R., 369 U.S. 672, 677, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962):

"Bond premium is the amount a purchaser pays in buying a bond that exceeds the face or call value of the bond. When a bond sells at a premium, it is generally because the interest it bears exceeds the rate of return on similar securities in the current market. For the right to receive this higher interest rate the purchaser of a bond pays a premium price when making the investment. However, interest is taxable to the recipient, and when a premium has been paid the actual interest received is not a true reflection of the bond's yield, but rep-

resents in part a return of the premium paid. It was to give effect to this principle that Congress in 1942 enacted Section 125 of the 1939 Code, which for the first time provided for amortization of bond premium for tax purposes." 369 U.S. at 677, 82 S.Ct. at 1083-1084.

In that case the bonds were callable at the option of the seller, either in whole at a "general" call price, or in part at a lower, "special" call price. No "put" or other protective device was involved, and the question for decision was whether the amount of the amortization deduction should be based on the general call price or the special call price. The Court said:

"During the period the petitioners held their bonds, none were called at either price, but the risk incurred that they would be called was present with equal force as to both the general and special call provisions. The market for bonds reflects that risk, and the Section of the Code we are asked to interpret takes cognizance of that market reality." 369 U.S. at 680, 82 S.Ct. at 1085.

In the instant case the "put" option protected taxpayer against the risk of loss from the possible call of the bonds, that is, the "market reality" of which the applicable section of the Code "takes cognizance".[2]

In several cases in which the facts were similar to those in the case at bar with one important exception—in those cases there was no "put" agreement—it was held that the taxpayer was entitled to an amortization deduction as well as to a deduction for the charitable contribution. Maysteel Products, Inc. v. Commissioner, 7 Cir., 287 F.2d 429 (1961); Fabreeka Products Co. v. Commissioner, 1 Cir., 294 F.2d 876 (1961); Humphreys v. Commissioner, 6 Cir., 301 F.2d 33 (1962). In each of those cases,

2. In Hanover Bank the Court noted: "Government does not contend that the transactions entered into by the petitioners were a sham without any business purpose except to gain a tax advantage," 369 U.S. at 682, 82 S.Ct. at 1086 referring to Knetsch and Gregory in a footnote.

however, the appellate court emphasized that the transactions were not "shams"; that "the taxpayer was exposed to all of the usual risks involved in such transactions", 287 F.2d at 431: and that "[d]uring the necessary holding period they [taxpayers] incurred fully all of the risks of ownership, both that the bonds might decline in value, a real risk, as Sherman learned to his cost, and the possibilities that during that time they might be called." 294 F.2d at 878.

The government contends that the "put" option in the case at bar is a vital distinguishing factor, requiring the disallowance of the amortization deduction. This court agrees. The "put" option eliminated the usual risks involved in such transactions, both the risk of loss from a decline in value of the bonds below 108 and the risk of loss from the possibility that the bonds might be called before the transaction was completed by the gift to the Foundation of the equity in the bonds. In substance, this is what was done; instead of making an outright contribution of $8,225 to the Foundation, Halle attempted to manipulate a $10,000 expenditure into an amortization deduction of $9,500, an interest expense

of $500 and a charitable contribution of $8,225.

The bonds yielded interest at 3% per annum on $100,000. Halle borrowed $100,500 at 3¼% interest. The interest expense and the interest earned on the bonds, which increased the amount of the charitable gift, offset each other.

The Tax Court allowed a full amortization deduction in Industrial Research Products, Inc., 40 T.C. 578 (1963), despite the fact that the bond seller had granted a "put" option. That case was presented and decided on a different theory from the one the government is advancing here. There the contention was that the deduction should be limited to the difference between the basis of the bonds and the "put" price. The "sham" argument was not discussed and apparently was not raised. Nor did the Tax Court discuss the reasons for the decisions in Maysteel, Fabreeka and Humphreys; indeed, it did not even cite those cases. This Court has concluded that it should apply to the facts of the instant case the reasoning in the Maysteel, Fabreeka and Humphreys opinions, and the principles announced and followed in Gregory, Knetsch and Bridges.[3]

3. In Bridges v. C.I.R., 325 F.2d 180, at 184, 185, the Fourth Circuit said:
"The Court in Knetsch held that the tax reduction motive or intent is immaterial in such cases and that the determinative question as to 'whether what was done, apart from the tax motive, was the thing which the statute intended' is answered in the negative if it is apparent 'that there was nothing of substance to be realized by [the taxpayer] from [the] transaction beyond a tax deduction.' There the Court concluded that it was clearly apparent that 'Knetsch's transaction with the insurance company did "not appreciably affect his beneficial interest except to reduce his tax"'. In view of such a finding, the Court held that the transaction was a sham and did not create an 'indebtedness' within the intent of the interest deduction statute. Although the Court speaks in terms of what Knetsch, the taxpayer, actually got 'for his out-of-pocket difference,' it is clear from the opinion as a whole that, as the result might apply to situations generally, what the Court meant was not

so much what the taxpayer ultimately gets for his outlay, but rather what are the *possibilities* in that regard under the terms of the specific transaction under consideration. We do not construe the Court to mean, nor do we intend to hold, that the transaction is a sham simply because it proves to be unprofitable and even though it results in a loss and a reduction of income tax liability. If there is, under the realities of the terms of the transaction, some reasonable hope of the transaction appreciably affecting the taxpayer's beneficial interest other than by a tax reduction, the transaction would not be a sham for tax purposes. See Hanover Bank v. Commissioner, 369 U.S. 672 [82 S.Ct. 1080, 8 L.Ed.2d 187], * * * (1962); Nassau Lens Co. v. Commissioner, 308 F.2d 39 (2d Cir. 1962); Maysteel Products, Inc. v. Commissioner, 287 F.2d 429 (7th Cir. 1961); Luden's, Inc. v. United States, 196 F. Supp. 526 (E.D.Pa.1961); Stanton v. Commissioner, 34 T.C. 1 (1960). Furthermore, if there is, under the realities of the terms of the transaction, some

The transaction in the instant case may properly be called a sham, as that term is used in the cases cited. But the label is less important than the conclusion that the "put" option takes the transaction out of the class intended to be covered by the applicable statute. What the Court said in Gregory applies here:

"The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." 293 U.S. at 470, 55 S. Ct. at 268.

Judgment will be entered for the defendant, with costs.

---

real risk of loss to the taxpayer, other than whatever loss might be actually 'built-in' (as it was in the instant case), the transaction would not be a sham for tax purposes. See Humphreys v. Com-

missioner, 301 F.2d 33 (6th Cir. 1962); Fabreeka Products Company v. Commissioner, 294 F.2d 876 (1st Cir. 1961); Maysteel Products, Inc. v. Commissioner, supra."