N. Louis Stone and Margaret M. Stone v. Commissioner.
Stone v. Commissioner
Docket No. 70164.
United States Tax Court
T.C. Memo 1965-156; 1965 Tax Ct. Memo LEXIS 174; 24 T.C.M. (CCH) 830; T.C.M. (RIA) 65156; June 10, 1965
Jack H. Calechman, for the petitioners. Albert R. Doyle, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in the petitioners' income tax for the years 1952, 1953 and 1954 in the respective amounts of $19,150.48, $16,225.61 and $21,369.27. The parties have reached agreement on all issues relative to the taxable year 1954. The remaining issues before us are (1) whether *175 petitioners are entitled to deductions for amortization of bond premiums in 1952 and 1953 within the meaning of sections 23(v) and 125 of the Internal Revenue Code of 1939[1] and (2) whether petitioners are entitled to deductions for charitable contributions in 1952 and 1953 under section 23(o). Findings of Fact Some of the facts were stipulated and they are so found. N. Louis Stone and Margaret M. Stone, husband and wife, are residents of Taunton, Massachusetts. They filed their joint income tax returns for the years 1952, 1953 and 1954 with the district director of internal revenue for the district of Massachusetts. N. Louis Stone will hereinafter be called the petitioner. On May 16, 1952 petitioner, a corporate executive, purchased through a Boston, Massachusetts, bond dealer, Livingstone & Company, 50M Appalachian Electric Power 3 3/4 percent bonds of 1981 for $55,333.34. The confirmation slip of Livingstone & Company showed the total cost of $55,333.34 made up of the following items: principal, $54,312.50; interest accrued, $895.84; and commission, $125. The *176 purchase journal of Livingstone & Company reflected the purchase of the Appalachian bonds on May 16, 1952 as a purchase from Dean Witter & Co., another broker. Appalachian Electric Power 3 3/4 percent bonds of 1981 were callable by the obligors at any time, in whole or in part, on 30 days' notice at a price of 102 3/8. On May 20, 1952 petitioner deposited $3,333.34 to his account with Livingstone & Company. To finance the balance of the purchase price of the bonds, petitioner borrowed $52,000 on May 26, 1952 from the Harvard Trust Company, a bank in Cambridge, Massachusetts. The loan was due June 30, 1952. The loan was arranged by Livingstone &company. On May 29, 1952 the Harvard Trust Company notified petitioner that the proceeds of his $52,000 loan had been paid to Dean Witter & Co. against the receipt of the Appalachian bonds. On June 23, 1952 petitioner assigned all his right, title and interest in the Appalachian bonds to the Stone Charitable Foundation, Inc. (hereinafter referred to as the Foundation). The assignment was subject to the lien against the bonds in favor of the Harvard Trust Company. The Foundation is a non-stock corporation founded November 17, 1947. During *177 the years 1952, 1953 and 1954 it was a tax-exempt charity within the applicable provisions of section 101(6) of the Internal Revenue Code of 1939 and section 501(c)(3) of the Internal Revenue Code of 1954. During the years 1952, 1953 and 1954 the officers of the Foundation were as follows: President - Stephen A. Stone… (petitioner's nephew) Secretary - Abraham Stone… (petitioner's brother) Treasurer - Alfred P. Rudnick… (attorney for various members of Stone family) On June 27, 1952 the Foundation sold, through Livingstone & Company, the Appalachian bonds which had been assigned to it on June 23, 1952. The confirmation slip of Livingstone & Company showed a total sales price in the amount of $54,641.67 made up of the following items: principal, $54,500; interest, $166.67; and a tax of $25. The sale was reflected on Livingstone & Company's sales journal as a sale by the Foundation and a purchase to the inventory of Livingstone & Company. On June 27, 1952 petitioner purchased through Livingstone & Company 50M Appalachian Electric Power 3 3/4 percent bonds of 1981 for $54,816.67. The purchase was reflected in Livingstone & Company's purchase journal *178 as a purchase by petitioner from the inventory of Livingstone & Company. On June 30, 1952 petitioner executed a new $52,000 note, with a due date of August 4, 1952, in favor of the Harvard Trust Company. On June 30, 1952 petitioner deposited $2,816.67 to his account with Livingstone & Company. On July 28, 1952 petitioner assigned all of his right, title and interest in the bonds to the Foundation subject to the lien in favor of the Harvard Trust Company. On August 1, 1952 the Foundation sold the bonds through Livingstone & Company, and the sale was reflected in the sales journal of Livingstone & Company as a sale by the Foundation and a purchase to the inventory of Livingstone & Company. The confirmation slip of Livingstone & Company indicated a total sales price of $55,006.25. On August 1, 1952 petitioner purchased through Livingstone & Company 50M Appalachian Electric Power 3 3/4 percent bonds of 1981 for $55,181.25. The purchase was reflected in the purchase journal of Livingstone & Company as a purchase by petitioner from the inventory of Livingstone & Company. On August 4, 1952 petitioner executed a new $52,000 note, with a due date of September 8, 1952, in favor of the Harvard *179 Trust Company. On August 4, 1952 petitioner deposited $3,181.25 to his account with Livingstone & Company. On September 2, 1952 petitioner assigned all of his right, title and interest in the bonds to the Foundation subject to the lien against the bonds in favor of the Harvard Trust Company. On September 5, 1952 the Foundation sold the bonds through Livingstone & Company, and the sale was reflected in the sales journal of Livingstone & Company as a sale by the Foundation and a purchase to the inventory of Livingstone & Company. The confirmation slip of Livingstone & Company indicated a total sales price of $55,183.34. On September 5, 1952 petitioner purchased through Livingstone & Company 50M Appalachian Electric Power 3 3/4 percent bonds of 1981 for $55,358.34, and the purchase was reflected in the purchase journal of Livingstone & Company as a purchase by petitioner from the inventory of Livingstone & Company. On September 8, 1952 petitioner executed a new $52,000 note, with a due date of October 11, 1952, in favor of the Harvard Trust Company. On September 8, 1952 petitioner deposited $3,358.34 to his account with Livingstone & Company. On October 6, 1952 petitioner assigned all *180 of his right, title and interest in the bonds to the Foundation subject to the lien against the bonds in favor of the Harvard Trust Company. On October 10, 1952 the Foundation sold the bonds through Livingstone & Company, and the sale was reflected in the sales journal of Livingstone & Company as a sale by the Foundation and a purchase by Livingstone & Company as agent for three other customers. The confirmation slip of Livingstone & Company indicated a total sales price of $55,355.21. Petitioner's loan with the Harvard Trust Company was liquidated on October 17, 1952 with the application of the proceeds of this sale. During all of the 1952 transactions set forth above the Appalachian bonds remained in the possession of the Harvard Trust Company. As a result of the above described transactions the petitioners claimed a deduction for amortization of bond premium on their 1952 income tax return in the amount of $13,937.50, computed as follows: Purchase
Amorti-
Date
Amount *
Call Price
zation
May 16, 1952
$54,437.50
$51,187.50
$ 3,250.00
June 27, 1952
54,625.00
51,187.50
3,437.50
Aug. 1, 1952
54,812.50
51,187.50
3,625.00
Sept. 5, 1952
54,812.50
51,187.50
3,625.00
Total
$13,937.50
*181 Also as a result of the above described transactions, the petitioners claimed deductions for charitable contributions to the Foundation totaling $12,661.47 on their 1952 income tax return. The charitable contribution deduction was computed by the petitioners in the following manner: The amount of the bank's lien was subtracted from the total of principal and interest shown on each of the four Livingstone & Company confirmation slips relating to the sales by the Foundation. The difference between the deduction as claimed on the return and the amount received by the charity resulted from the sales expenses incurred by the charity. On or about April 29, 1953 petitioner purchased through Livingstone & Company 25M Appalachian Electric Power 3 3/4 percent bonds of 1981 for $28,776.04. The purchase was reflected in the purchase journal of Livingstone & Company as a purchase by petitioner from the Foundation. On May 1, 1953 petitioner deposited $2,776.04 to his account with Livingstone & Company. To finance the balance of the purchase price of the bonds, the petitioner borrowed $26,000 from the Harvard Trust Company. The *182 loan was due on June 9, 1953. On June 5, 1953 petitioner assigned all of his right, title and interest in the bonds to the Foundation subject to the Harvard Trust Company's lien against the bonds. On June 5, 1953 the Foundation sold the Appalachian bonds through Livingstone & Company. The confirmation slip of Livingstone & Company indicated that the total sales price was $28,263.54. The sale was reflected in the sales journal of Livingstone & Company as a sale by the Foundation and a purchase by petitioner. On June 5, 1953 petitioner purchased through Livingstone & Company 25M Appalachian Electric Power 3 3/4 percent bonds of 1981 for $28,401.04, and the purchase was reflected in the purchase journal of Livingstone & Company as a purchase by petitioner from the Foundation. On June 12, 1953 petitioner executed a new $26,000 note, due July 14, 1953, in favor of the Harvard Trust Company. On June 10, 1953 petitioner deposited $2,401.04 to his account with Livingstone & Company. On July 10, 1953 petitioner assigned all of his right, title and interest in the bonds to the Foundation subject to the lien of the Harvard Trust Company against the bonds. On July 10, 1953 the Foundation sold *183 the Appalachian bonds through Livingstone & Company. The confirmation slip of Livingstone & Company indicated that the total sales price was $28,354.69. The sale was reflected in the sales journal of Livingstone & Company as a sale by the Foundation and a purchase by petitioner. On July 10, 1953 petitioner purchased through Livingstone & Company 25M Appalachian Electric Power 3 3/4 percent bonds of 1981 for $28,492.19. The purchase was reflected in the purchase journal of Livingstone & Company as a purchase by petitioner from the Foundation. On July 15, 1953 petitioner deposited $3,492.19 to his account with Livingstone & Company. On July 20, 1953 petitioer borrowed $25,000 from the First National Bank of Baltimore in Baltimore, Maryland. The loan was due on August 24, 1953. On August 14, 1953 petitioner assigned all of his right, title and interest in the bonds to the Foundation subject to the lien of the First National Bank of Baltimore against the bonds. On August 14, 1953 the Foundation sold the Appalachian bonds through Livingstone & Company, and the sale was reflected in the sales journal of Livingstone & Company as a sale by the Foundation and a purchase by petitioner. The *184 confirmation slip of Livingstone & Company indicated a total sales price of $28,505.73. On August 14, 1953 petitioner purchased, through Livingstone & Company, 25M Appalachian Electric Power 3 3/4 percent bonds of 1981 for $28,580.73. The purchase was reflected in the purchase journal of Livingstone & Company as a purchase by petitioner from the Foundation. On August 17, 1953 petitioner deposited $3,580.73 to his account with Livingstone & Company. On August 20, 1953 petitioner executed a new $25,000 note, due on or after October 2, 1953, in favor of the First National Bank of Baltimore. On September 18, 1953 petitioner assigned all of his right, title and interest in the bonds to the Stone Charitable Foundation subject to the lien of the First National Bank of Baltimore against the bonds. The Stone Charitable Foundation, a trust, was a different entity from the Foundation and was a tax-exempt charity during 1953 within the meaning of section 101(6) of the Internal Revenue Code of 1939. Abraham Stone, who was secretary of the Foundation, was a trustee of the Stone Charitable Foundation (trust); Dewey D. Stone and his brother, Harry K. Stone, were the other trustees. On September 18, 1953 the *185 Stone Charitable Foundation (trust) sold the Appalachian bonds through Livingstone & Company. The confirmation slip of Livingstone & Company indicated a total sales price of $28,969.27. The sale was not reflected in the sales journal of Livingstone & Company as a sale by the Stone Charitable Foundation (trust). It was shown as a purchase to Livingstone & Company's inventory in its purchase journal by an entry dated September 18, 1953. Petitioners claimed a deduction for amortization of bond premium on their 1953 income tax return in the amount of $11,125, computed as follows: Purchase
Amorti-
Date
Amount
Call Price
zation
Apr. 29, 1953
$28,375
$25.593.75
$ 2,781.25
June 5, 1953
28,375
25,593.75
2,781.25
July 10, 1953
28,375
25,593.75
2,781.25
Aug. 14, 1953
28,375
25,593.75
2,781.25
Total
$11,125.00
Petitioners also claimed, as a result of the above transactions in 1953, deductions for charitable contributions to the Foundation and to the Stone Charitable Foundation (trust) totaling $12,184.91 on their 1953 income tax return. The charitable contribution deduction was computed by the petitioners in the following manner: The *186 amount of the bank's lien was subtracted from the total of principal and interest shown on each of the four confirmation slips of Livingstone & Company relating to the sales by the Foundation and the Stone Charitable Foundation (trust). The difference between the deduction as claimed on the return and the amount received by the charities resulted from sales expenses incurred by the charities. The Appalachian bonds involved in the 1952 transactions were not the same bonds involved in the 1953 transactions. The Appalachian bonds involved in the 1953 transactions remained in the possession of the respective lending banks (the Harvard Trust Company and the First National Bank of Baltimore) from the first purchase by petitioner to the last sale by the Stone Charitable Foundation (trust) in 1953. Opinion Respondent in his notice of deficiency disallowed the entire amortization deductions claimed by petitioner in 1952 and 1953 in the respective amounts of $13,937.50 and $11,125. Respondent also disallowed the entire charitable contributions to the Foundation and to the charitable trust in 1952 and 1953 in the respective amounts of $12,661.47 and $12,184.91. Respondent now concedes that *187 the petitioner is entitled to one amortization deduction in each of the years 1952 and 1953 based upon the premiums paid on the initial purchases of bonds in those years. [2] However, respondent contends that the second, third and fourth transactions in each of the years were sham transactions without economic reality which cannot support any further amortization deductions. (See Rev. Rul. 62-127, 1962-2 C.B. 84). Respondent also concedes that, if this Court finds that the petitioner is not entitled to the second, third and fourth bond premium amortization deductions in 1952 and 1953, petitioner is entitled to charitable contributions for each of the four contributions to the Foundation and the charitable trust in 1952 and 1953. Respondent also concedes the interest deductions claimed *188 by petitioner in connection with the bank loans which financed the transactions. We are persuaded that the transactions in 1952 and 1953 in which petitioner, subsequent to his original purchase of the bonds through Livingstone & Company, purported to purchase the same bonds from Livingstone & Company a second, third and fourth time were a sham without any purpose except to gain a tax advantage. A tax deduction will not arise from a sham transaction. Knetsch v. United States, 364 U.S. 361. The record clearly indicates a prearranged plan in which these round trips were contemplated from the start, i.e., the original bond purchase by petitioner financed by a bank loan and a relatively small amount of cash, the assignment of the bonds after 30 days to the Foundation, the sale of the bonds by the Foundation to Livingstone & Company, and then the sale of the bonds by Livingstone & Company back to petitioner, who then (after waiting at least 30 days) would start the whole process all over again. Many of the forms involved in the various steps were made out by Livingstone & Company for the guidance of the participants, which is significant in the context of this case. In *189 all eight transactions in 1952 and 1953 the date of the sale of the bonds by the Foundation to Livingstone & Company coincided with the date of sale of an identical amount of bonds by Livingstone & Company back to petitioner. In 1953 the process was further speeded up: In each of the four transactions in that year the assignment of the bonds by petitioner to the Foundation, the sale of the bonds by the Foundation to Livingstone & Company, and the sale of the bonds by Livingstone & Company back to petitioner all took place on the same date. We do not believe that these transactions in 1952 and 1953, subsequent to the original bond purchases in those years, resulted in genuine bond purchases by petitioner. Certainly the purely formal purchases and resales by Livingstone & Company, which were in each instance practically simultaneous, cannot be regarded as genuine. We note also that during all of the 1952 transactions the Appalachian bonds remained in the possession of the Harvard Trust Company and that the Appalachian bonds involved in the 1953 transactions (which were not the same bonds involved in the 1952 transactions) remained in the possession of the respective lending banks from *190 the first purchase by petitioner to the last sale by the charitable trust in 1953. In effect, the petitioner is seeking to deduct essentially the same bond premium over and over again within a single year. We believe that the allowance of an amortization deduction based on the original bond purchases in 1952 and 1953 and an allowance of the charitable contributions to the Foundation in full in both years will accurately reflect the true economic nature of the transaction before us. We note that petitioner's actual cash deposits in connection with the four sets of bond purchases in 1952 and 1953 were $12,689.60 and $12,250, respectively. [3] The deductions claimed for charitable contributions to the Foundation (or trust) in 1952 and 1953 were $12,661.47 and $12,184.91. In a recent case, David L. Lieb, 40 T.C. 161, this Court rejected a somewhat similar attempt by taxpayers to *191 secure multiple bond amortization deductions through the device of purported sales and purchases of bonds between a husband and wife. The husband made the original bond purchase, later purported to sell the bonds to his wife, and sometime after that purported to reacquire the bonds from his wife. All the necessary forms were carefully observed, including a promissory note executed by the wife in favor of a bank to finance the bond purchase. On the basis of these transactions taxpayers claimed an amortization deduction in 1955 consisting of three components, i.e., in connection with the husband's original purchase, the wife's purchase of the bonds, and the reacquisition of the bonds by the husband. Respondent conceded that the amortization in connection with the original bond purchase by the husband was allowable. This Court found that the transactions were a sham and disallowed the remaining two components of the amortization deduction. As in the instant case, the evidence in the Lieb case indicated that the transactions were prearranged and that "the round-trip of these bonds had been planned from the beginning." Petitioner feels that the amortization deductions in 1952 and 1953 *192 must be allowed under the rationale of Fabreeka Products Co. v. Commissioner, 294 F. 2d 876 (C.A. 1). We do not think so. The taxpayer in the Lieb case also relied on Fabreeka Products Co. v. Commissioner, supra, and we stated "[that] case has bearing upon whether David would be entitled to an amortization deduction in connection with his original purchase of the bonds - a matter that is no longer in issue in this case - but it has no controlling relevance with respect to the bona fides of the subsequent sales inter sese of David and Sylvia and the availability of additional amortization deductions based upon such alleged sales". We hold that petitioner is not entitled to the amortization deductions in 1952 and 1953 based upon the purported bond purchases in each of those years subsequent to the original bond purchases in each year. Decision will be entered under Rule 50. Footnotes
1. All section references will be to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩
*. Interest accrued at the date of purchase is not included.↩
2. Section 23(v) of the Internal Revenue Code of 1939 allows a deduction for amortizable bond premium which, in section 125(b) of the 1939 Internal Revenue Code↩ is, in substance, defined as the difference between a bondholder's basis for determining loss on the sale or exchange of the bond and the amount payable on redemption of the bond at maturity or at the earliest call date.
3. The actual cash deposits by petitioner were as follows: ↩
1952
May 20, 1952
$3,333.34
June 30, 1952
2,816.67
Aug. 4, 1952
3,181.25
Sept. 8, 1952
3,358.34
1953
May 1, 1953
$2,776.04
June 10, 1953
2,401.04
July 15, 1953
3,492.19
Aug. 17, 1953
3,580.73