T.C. Memo. 2013-225

UNITED STATES TAX COURT

BANK OF NEW YORK MELLON CORPORATION, AS SUCCESSOR IN
INTEREST TO THE BANK OF NEW YORK COMPANY, INC., Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 26683-09.                     Filed September 23, 2013.

B. John Williams, Jr., Alan J.J. Swirski, Julia M. Kazaks, Cary D. Pugh,

Andrew J. McLean, Daniel C. Davis, Melissa R. Middleton, Brendan T. O'Dell,

Bryon Christensen,[1] Shira M. Helstrom, John Marston, Manoj Viswanathan, Ilana

Yergin, Daniel Davis, and Kristin R. Keeling, for petitioner.

Jill A. Frisch, Curt M. Rubin, Anne O'Brien Hintermeister, Matthew J.

Avon, Justin L. Campolieta, and Michael A. Sienkiewicz, for respondent.

---

[*]This opinion supplements our prior Opinion, Bank of New York Mellon
Corp. v. Commissioner, 140 T.C. 15 (2013).

[1]Bryon Christensen, John Marston, Manoj Viswanathan, Ilana Yergin,
Daniel Davis and Kristin R. Keeling all withdrew as counsel after trial.

**[*2]**                    SUPPLEMENTAL MEMORANDUM OPINION

KROUPA, <u>Judge</u>:  This case is before the Court on petitioner's Rule 161[2]

motion (motion) regarding this Court's Opinion, <u>Bank of New York Mellon Corp.</u>

<u>v. Commissioner</u>, 140 T.C. 15 (2013) (<u>BNY I</u>).  Petitioner does not challenge the

primary holdings in <u>BNY I</u> that the STARS structure lacks economic substance

and that respondent properly disallowed the foreign tax credits and the foreign tax

expense deductions generated from the STARS structure.  Petitioner instead asks

this Court to further consider certain corollary aspects of <u>BNY I</u> that flow from our

adopting a bifurcation approach in reaching the primary holdings of <u>BNY I</u>.  We

will grant the motion to the extent it allows us to more fully consider those

corollary aspects of <u>BNY I</u>.[3]

---

[2]Unless otherwise indicated, Rule references are to the Tax Court Rules of Practice and Procedure, and section references are to the Internal Revenue Code (Code) in effect for the years at issue.

[3]In granting the motion, we note that the motion as titled is misleading because petitioner merely asks us to address certain corollary aspects of <u>BNY I</u> rather than to reconsider the primary holdings of <u>BNY I</u>.

**[*3]**                                    <u>Background</u>

We incorporate the findings of fact we made in <u>BNY I</u>.[4]  For convenience and clarity, we briefly summarize and repeat some of the <u>BNY I</u> findings.

Petitioner engaged in the STARS transaction with the help of Barclays.  As part of the STARS transaction, petitioner created the STARS structure, which included several special-purpose entities.  One of these special-purpose entities was a common law trust (trust).  Petitioner transferred, through several related steps, approximately $7.86 billion in net income-producing assets to the trust.  The trust had a trustee that was a resident of the United Kingdom for U.K. tax purposes.  Accordingly, the trust was subject to U.K. tax on its income.  The trust was authorized to issue class A units, a class B unit, a class C unit and a class D unit.

Barclays entered a subscription agreement to purchase the trust's class C unit for $1.469 billion and the trust's class D unit for $25 million.  Barclays was entitled to distributions on the class D unit equal to $25 million × (1-month LIBOR plus 415 basis points × 0.78).  Barclays was also entitled to certain distributions on the class C unit.  The subscription agreement required Barclays to

---

[4]Unless otherwise indicated, defined terms continue to have the meaning ascribed to them in <u>BNY I</u>.

[*4] pay further subscription amounts to the trust equal to the amount of any distributions it was entitled to receive on the class C unit. Petitioner established a blocked account in Barclays' name (Barclays blocked account) to ensure payment of these further subscription amounts. Barclays could not access or control the Barclays blocked account. Petitioner and Barclays agreed that all class C unit distributions were to be paid to the Barclays blocked account and all further subscription amounts Barclays owed under the subscription agreement were to be paid from the Barclays blocked account.

InvestCo was another special-purpose entity petitioner used in the STARS structure. InvestCo and Barclays entered into forward sale agreements and a zero coupon swap agreement in connection with the STARS transaction. The forward sale agreements required InvestCo to purchase the class C unit and class D unit from Barclays for a pre-determined price on a certain date. The zero coupon swap agreement required InvestCo to make monthly payments to Barclays. The monthly payments to Barclays were equal to the 1-month LIBOR plus 30 basis points on a notional principal amount of $1.475 billion, less the spread.[5] In return,

---

[5]The spread was a fixed amount equal to one-half the present value of the U.K. taxes Barclays was expected to pay on anticipated class C unit income each month.

**[\*5]** the zero coupon swap agreement required Barclays to make a fixed payment to Investco after a certain number of years.

Barclays also entered into a credit default swap agreement with petitioner in connection with the STARS transaction. Petitioner guaranteed, under the credit default swap agreement, all of InvestCo's obligations under the forward sale agreements and the zero coupon swap agreement in case of InvestCo's bankruptcy or default. In return, Barclays paid petitioner a fixed rate of 10 basis points on the $1.475 billion notional principal amount.

We found in BNY I that the net effect of the forward sale agreements, the zero coupon swap agreement and the credit default swap agreement was to convert Barclays' initial subscriptions for the class C unit and the class D unit into a $1.5 billion loan from Barclays to petitioner (loan). We further found that the interest on the loan was equal to 1-month LIBOR plus 20 basis points.[6]

Petitioner treated the spread as a component of the interest accruing on the loan. The spread payable to petitioner under the loan was greater than the amount

---

[6]Expressing the interest as 1-month LIBOR plus 20 basis points is for purposes of simplicity. In BNY I we found that three elements made up the interest on the loan: (1) the monthly distribution on the class D unit; (2) the monthly floating payment owed under the swap agreement excluding the spread (i.e., 1-month LIBOR plus 30 basis points on a notional amount of $1.475 billion); and (3) the monthly payment owed on the credit default swap agreement.

[*6] payable to Barclays under the loan for each year at issue. Barclays therefore made net payments to petitioner under the loan for each year at issue. Petitioner reduced the spread it recognized as income by offsetting the spread by the amount payable to Barclays under the loan. In BNY I, we found that the spread was not a component of interest on the loan. Accordingly, we found that petitioner effectively deducted the amount payable to Barclays under the loan.[7]

We held in BNY I that the STARS transaction should be bifurcated into the STARS structure and the loan for purposes of determining whether the economic substance doctrine barred petitioner from claiming the foreign tax credits and the foreign tax expense deductions for the years at issue. Accordingly, we analyzed the economic substance of the STARS structure separately from the loan. We held that the STARS structure lacks economic substance and that petitioner was not entitled to the interest deductions it had effectively taken on the loan because the interest expense was incurred in furtherance of a transaction lacking economic substance.

---

[7]By way of example, assume that Barclays owed petitioner $100 of spread in year 1. Further assume that petitioner owed Barclays $60 of interest on the zero coupon swap agreement in year 1. BNY would report only $40 of spread in its income in year 1. In BNY I we found that petitioner effectively deducted the $60 of interest it owed to Barclays by reducing the amount of spread it reported as income.

**[*7]**                                    Discussion

Petitioner asks that we further consider certain corollary aspects of <u>BNY I</u>.

As we previously noted, petitioner does not challenge the primary holdings in

<u>BNY I</u> that the STARS structure lacks economic substance and that the foreign tax

credits and foreign tax expense deductions claimed in connection with the STARS

structure are disallowed. We first address the standard this Court uses to decide

whether to grant a Rule 161 motion. We then address petitioner's contentions, in

turn.

A.  <u>Rule 161 Motion</u>

We begin with the standard this Court uses to decide whether to grant a

Rule 161 motion. The decision as to whether to grant a Rule 161 motion rests

within the Court's discretion. <u>CWT Farms, Inc. v. Commissioner</u>, 79 T.C. 1054,

1057 (1982), <u>aff'd</u>, 755 F.2d 790 (11th Cir. 1985).

Petitioner relies on newly minted arguments in asking the Court to further

consider certain corollary aspects of <u>BNY I</u>. Further considering any aspect of

<u>BNY I</u> based on new arguments at this point in the proceedings gives the Court

great pause because a Rule 161 motion is generally not the appropriate forum to

tender new theories. <u>Compare</u> <u>Koufman v. Commissioner</u>, 69 T.C. 473, 476

(1977) (rejecting the Commissioner's offer of a new theory on which to base an

**[\*8]** increased deficiency after the Court entered its decision) with Gilman v. Commissioner, T.C. Memo. 1990-205 (vacating in part a prior decision and holding instead that the interest paid on a note was deductible based on the Commissioner's concession). Respondent correctly notes that petitioner could have raised these arguments in at least one of the several opportunities it was given in the BNY I proceedings.[8] We will nevertheless grant petitioner's motion to allow the Court to more fully consider certain corollary aspects of BNY I and to bring those corollary aspects into harmony with the primary holdings of BNY I.

B. Deductibility of Interest on the Loan

We now more fully consider whether the interest on the loan is deductible. Petitioner maintained throughout the entirety of the BNY I proceedings that it did not deduct interest on the loan.[9] Rather, petitioner argued that the loan interest and the spread should be treated as though they were paid under an integrated contract. We bifurcated the STARS transaction into the loan and the STARS structure. We found that the loan proceeds were available for use in petitioner's

---

[8]See infra note 9.

[9]Petitioner maintained this position in the petition it filed with the Court, in the pre-trial memorandum it filed with the Court, in the post-trial memorandum it filed with the Court, and in the reply memorandum it filed with the Court. Petitioner continues to maintain this position in the third argument it makes in the motion. As previously noted, we addressed and rejected this argument in BNY I.

**[*9]** banking business throughout the STARS transaction. Petitioner uses this finding to now argue that a deduction for interest on the loan should be allowed. Petitioner argues that the logical extension of this finding is that the loan was not necessary for the STARS structure to produce the disallowed foreign tax credits.[10] As such, petitioner continues, the loan served a purpose beyond the creation of tax benefits.

A deduction is generally allowed for all interest paid or accrued within the taxable year on indebtedness. Sec. 163(a). An appeal in this case would lie to the U.S. Court of Appeals for the Second Circuit (Second Circuit) absent a stipulation to the contrary. Where the Court of Appeals to which appeal lies has decided an issue that is presently before us, we will follow the decision of that court. Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

---

[10]Petitioner also argues that where a routine business transaction is coupled with a sham transaction, the tax consequences of the routine business transaction must be respected. Petitioner contends this position is supported by Rose v. Commissioner, 88 T.C. 386, 423-424 (1987) (following Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 96 (4th Cir. 1985)), aff'd, 868 F. 2d 851 (6th Cir. 1989)). In Rose, we held that a genuine debt undertaken to finance a transaction lacking economic substance will support an interest deduction. Id. The Court of Appeals for the Second Circuit has explicitly rejected such a rule. Lee v. Commissioner, 155 F.3d 584, 586-587 (2d Cir. 1998), aff'g in part, remanding in part T.C. Memo. 1997-172.

**[\*10]** The Second Circuit has held that an interest deduction is not allowed if the interest payment arises from a transaction that is economically empty. Lee v. Commissioner, 155 F.3d 584, 586 (2d Cir. 1998) (citing Knetsch v. United States, 364 U.S. 361 (1960)), aff'g in part, remanding in part on another ground T.C. Memo. 1997-172. A transaction is economically empty if it cannot, with reason, be said to have purpose, substance or utility apart from its anticipated tax consequences. Id. (citing Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), aff'g 44 T.C. 284 (1965)).

Petitioner maintains the loan interest is deductible under Lee and Goldstein because, as we found in BNY I, the loan proceeds were not used to finance the STARS structure. Respondent contends that the holdings in Lee and Goldstein bar petitioner's deduction of the loan interest. Respondent acknowledges that the tax shelters at issue in Goldstein and Lee produced one tax benefit while the STARS transaction produced two tax benefits. Respondent argues, however, that the presence of the second tax benefit does not distinguish the STARS transaction from the tax shelters in Lee and Goldstein. On further consideration, we agree with petitioner.

The disallowed interest deductions in Lee and Goldstein arose from loans that were integral or intertwined with a transaction lacking economic substance.

[*11] In this regard, the loans in <u>Lee</u> and <u>Goldstein</u> generating the disallowed interest deductions financed an investment or transaction lacking economic substance. The sole benefit and purpose of the transactions and related loans in <u>Lee</u> and <u>Goldstein</u> were to generate interest deductions (as well as deductions for other expenses in <u>Lee</u>) to offset income from other sources.

The loan here differs from the loans in <u>Lee</u> and <u>Goldstein</u>. Petitioner did not use the loan proceeds to finance, secure or carry out the STARS structure. The loan was not necessary for the STARS structure to produce the disallowed foreign tax credits. Rather, the loan proceeds were available for petitioner to use in its banking business throughout the STARS transaction. Accordingly, the loan served a purpose beyond the creation of tax benefits, unlike the loans in <u>Goldstein</u> and <u>Lee</u>.

Respondent also argues that because petitioner could have obtained a loan at a lower cost in the market place, the loan interest deductions must be denied. We disagree. We have held that a grossly mispriced asset or negative cashflow can contribute to the overall picture of an economic sham. <u>Blum v. Commissioner</u>, T.C. Memo. 2012-16 (citing <u>Country Pine Fin., LLC v. Commissioner</u>, T.C. Memo. 2009-251); <u>see also</u> <u>Crispin v. Commissioner</u>, T.C. Memo. 2012-70, <u>aff'd</u>, 708 F.3d 507 (3d Cir. 2013). Nevertheless, interest

[*12] accruing on a real loan that is used for economically substantive activity is deductible under section 163(a) even if the borrower is also motivated by favorable tax consequences. See Lee v. Commissioner, 155 F.3d at 586. Despite being overpriced, the loan proceeds were available for use in petitioner's banking business. Accordingly, we hold that petitioner is entitled to deduct the interest that accrued on the loan for the years at issue.

C. Treatment of the Spread

We now address the Federal income tax consequences of the spread. Petitioner reported a portion of the spread as income on the tax returns it filed for the years at issue. Petitioner now argues that the spread is not includible in its income for the years at issue.

Respondent issued a statutory notice to petitioner disallowing certain interest deductions respondent attributed to the STARS transaction. The disallowed interest deductions were approximately equal to the 1-month LIBOR plus 30 basis points on the $1.475 billion notional principal amount, the amount petitioner owed to Barclays under the zero coupon swap agreement (zero coupon interest). We sustained respondent's determination disallowing the zero coupon interest deductions. We found in BNY I that petitioner effectively deducted the zero coupon interest by reducing the amount of spread it included in its income by

**[\*13]** an amount equal to the zero coupon interest. Our finding in BNY I that petitioner effectively deducted the zero coupon interest was predicated on the spread's being includible in petitioner's income. Petitioner's spread argument would affect our finding in BNY I that petitioner effectively deducted the zero coupon interest. Accordingly, we now focus on the spread and how it should be treated for Federal income tax purposes.

Petitioner raises two arguments regarding the spread. Petitioner contends that, because we found the STARS structure to lack economic substance, we must also disregard the spread. Petitioner also argues that we must disregard the spread under the tax benefit rule.[11] We agree with petitioner that the spread is not includible in its income. We so hold because the spread arose from the STARS structure, a transaction we found in BNY I to lack economic substance.[12]

A transaction that lacks economic substance is disregarded for Federal tax purposes. ACM P'ship v. Commissioner, 157 F.3d 231, 261 (1998), aff'g in part, rev'g in part T.C. Memo. 1997-115; Gerdau Macsteel, Inc. v. Commissioner, 139

---

[11]The tax benefit rule generally excludes from gross income the recovery of an expense that did not result in a prior tax benefit. Hillsboro Nat'l Bank v. Commissioner, 460 U.S. 370 (1983).

[12]We therefore need not address petitioner's tax benefit argument for excluding the spread from income.

[*14] T.C. 67, 168 (2012); Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 278 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001). We have held that the economic substance doctrine cannot be applied selectively to certain consequences of a transaction. Sheldon v. Commissioner, 94 T.C. 738, 762 (1990). Instead, we have given effect either to both the cost and income functions of a transaction or to neither when applying the economic substance doctrine. See id.; Saba P'ship v. Commissioner, T.C. Memo. 1999-359, vacated and remanded, 273 F.3d 1135 (D.C. Cir. 2001); Arrowhead Mountain Getaway, Ltd. v. Commissioner, T.C. Memo. 1995-54, aff'd without published opinion, 119 F.3d 5 (9th Cir. 1997); Seykota v. Commissioner, T.C. Memo. 1991-541.

Barclays paid petitioner the spread in connection with the STARS structure. We analyzed the economics of the spread in BNY I. We held that the spread arose from the anticipated tax benefits of the STARS structure. We further held that the STARS structure lacks economic substance. It follows that the spread arose from a transaction lacking economic substance. Consequently, we do not give effect to the spread and it is not includible in petitioner's income for the years at issue.

We now further consider whether respondent properly disallowed certain interest expense deductions he attributed to the STARS transaction. We found in BNY I that petitioner effectively deducted the zero coupon interest by reducing the

**[\*15]** amount of spread it included in its income by an amount equal to the zero coupon interest. As a result, we sustained respondent's determination reducing petitioner's interest expense by an amount equal to the zero coupon interest. Our finding that petitioner effectively deducted the zero coupon interest rested on our unchallenged assumption that the spread was includible in petitioner's income. Stated differently, petitioner could not have effectively deducted the zero coupon interest if petitioner could not have reduced the amount of the spread that was includible in its income. We found upon further consideration that the spread was not includible in petitioner's income for the years at issue. It follows, then, that petitioner could not have reduced the amount of the spread that was includible in its income because none of the spread was includible in its income. Consequently, petitioner could not have effectively deducted the zero coupon interest. Accordingly, respondent disallowed petitioner's interest expense that was unrelated to the STARS transaction. We therefore do not sustain respondent's determination in the statutory notice disallowing the unrelated interest expense.

We have considered all remaining arguments the parties made and, to the extent not addressed, we find them to be irrelevant, moot or meritless.

**[\*16]**  To reflect the foregoing,

       <u>An appropriate order will be issued</u>

<u>granting petitioner's motion, and decision</u>

<u>will be entered under Rule 155</u>.